**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **METROPOLITAN GOVERNMENT OF** | ) | |
| **NASHVILLE AND DAVIDSON COUNTY,** | ) | |
| **TENNESSEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06cv0321** |
| | ) | |
| **BELLSOUTH TELECOMMUNICATIONS, INC.,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Before the Court are cross motions for summary judgment filed by Plaintiff Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") and by Defendant BellSouth Telecommunications, Inc. ("BST"). (Doc. No. 27 (Plaintiff's motion); Doc. No. 30 (Defendant's motion).) Both motions have been fully briefed, and a hearing on the issues was conducted on Thursday, June 28, 2007 at 10:00 a.m.

Both parties seek summary judgment as to all three Counts in Metro's Complaint. The legal issue presented by Count One is whether Metro or BST is responsible for paying the costs associated with relocating BST's lines and facilities in order to accommodate the excavation and construction of the new underground parking garage and park (the "Public Square project") in front of the Metropolitan Nashville and Davidson County Courthouse ("Metro Courthouse") in downtown Nashville. In Counts Two and Three, Metro seeks a declaration and an injunction regarding BST's obligation to relocate its facilities and equipment located within the public rights-of-way to accommodate future public works or projects, at its own cost, upon Metro's reasonable request.

Having reviewed the parties' filings and heard oral arguments on the pertinent issues, the Court finds that Metro's motion for summary judgment as to Count One must be denied and BST's motion regarding the same count should be granted. As to Count Three, the Court will deny Metro's request for an injunction, and will grant summary judgment to BST as to that count. However, the Court finds that a limited declaration is appropriate to clarify the parties' legal relations and prevent future litigation. The

Court will therefore grant Metro's motion for summary judgment as to Count Two, and will deny BST's motion for summary judgment on that issue, as set forth in greater detail below.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party has the burden of showing an "absence of a genuine issue of material fact as to an essential element of the nonmovant's case."  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989).  The moving party may do this by providing affidavits or other proof or by showing lack of evidence on an issue for which the non-moving party will have the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-moving party must then present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991).  The court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.  *Westfield Ins. Co. v. Tech Dry. Inc.*, 336 F.3d 503, 506–07 (6th Cir. 2003); *Taft Broad. Co.*, 929 F.2d at 248.  Thus, when a court denies summary judgment to one party on the ground that it is granting summary judgment to another party, the denial of summary judgment is based on a legal conclusion rather than the district court's finding of a genuine issue of material fact.  *Black v. Roadway Express, Inc.*, 297 F.3d 445, 448 (6th Cir. 2002).  However, "[t]he fact that both parties make motions for summary judgment . . . does not require the Court to rule that no fact issue exists."  *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948) (cited with approval in *Cherokee Ins. Co. v. E.W. Blanch Co.*, 66 F.3d 117, 122 n.4 (6th Cir. 1995)).  If inferences may be drawn in favor of either party, it may be appropriate to deny summary judgment to both parties.  *See Taft Broad. Co.*, 929 F.2d at 248 (6th Cir. 1991) (reversing an order granting summary

judgment on cross-motions for summary judgment and a "stipulated" factual record and denying both motions on the grounds that it was possible to draw inferences in either direction).

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff Metro is a governmental entity created and existing under and by virtue of the constitution and laws of the State of Tennessee.  Among other municipal functions, Metro maintains a system of streets, roads, parks and other public properties.  Defendant BST owns and operates a business that provides telecommunications and other services in Davidson County and throughout Tennessee.  In the course of its business, BST regularly places, operates and maintains wires, poles, devices and equipment in areas comprising public rights-of-way.

BST operates and maintains its telecommunications lines and facilities along the streets and within cities of Tennessee pursuant to a statewide grant of authority to do so set forth in Tenn. Code Ann. § 65-21-201, the original version of which was enacted in 1885.  In addition, in 1888, the City of Nashville entered into a non-exclusive franchise agreement with Cumberland Telephone & Telegraph Company, a predecessor of BST, giving the telephone company a non-exclusive "right to erect and maintain in operation telegraph poles, cables, and wires over the various streets, alleys and squares of the city . . . for the purpose of transmitting messages by telephone."  (Complaint, Ex. 1, at § 2.)  One of the areas where BST lawfully maintained lines and facilities pursuant to the franchise agreement and state law was in the right-of-way along Deaderick Street in downtown Nashville.

The present dispute arose in the context of the need to relocate BST's lines and equipment installed along the Deaderick Street right-of-way[2] to accommodate the excavation and construction of the underground parking facility, a component of the Public Square project.  The parties dispute which one of

---

[1]The Court notes that Metro failed to comply with Local Rule 56.01(c) in responding to BST's Statement of Undisputed Material Facts.  The referenced rule states specifically that a response to a statement of undisputed facts "must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts *and citations verbatim* as set forth by the movant."  (Emphasis added.)  Metro failed to reproduce the citations contained in BST's original Statement of Undisputed Material Facts.  Metro's counsel is admonished to familiarize himself and to comply with all Local Rules of this Court in the future.

[2]Until the 1970s, Deaderick Street crossed in front of the Metro Courthouse and connected to the Woodland Street Bridge on the west bank of the Cumberland River.  Since that time, the portion to the east of 3rd Avenue has been closed to through-traffic and used as a part of the surface parking lot in front of the Metro Courthouse, but it had never been formally abandoned as a right-of-way by the Metro Council.

them should be required to bear the cost of relocating BST's facilities and lines. BST refused to move its equipment and lines at its own expense and demanded that Metro pay the costs of relocation to BST in advance. In order to avoid a delay in construction of the Public Square project, Metro paid $97,777 in relocation costs directly to BST, under protest and with a reservation of rights, and paid an additional $175,725.89 directly to a Metro contractor to assist with the line relocation. The parties agree that Metro incurred costs totaling $273,502.89 in relocating BST's telecommunications facilities from the Deaderick Street right-of-way in connection with construction of the Public Square parking garage and park, and that such costs were reasonable in light of the work done.

Metro filed this action seeking recovery of the costs incurred in connection with moving BST's lines and equipment to accommodate the Public Square project. In addition, Metro seeks a declaration that BST is required by law and contract to relocate its facilities from a public right-of-way at its own cost whenever Metro reasonably requests that it relocate any such facilities that interfere with public works or projects. Metro also seeks a permanent injunction barring BST from refusing in the future to relocate at its cost equipment and facilities that interfere with roadway improvement work within Metro. (*See* Complaint, Counts 1-3.)

### III.    ANALYSIS AND DISCUSSION:  COUNT ONE

#### A.    The Legal Framework

"Under the traditional common law rule, utilities have been required to bear the cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." *Norfolk Redev. & Housing Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35 (1983) (citing E. McQuillin, The Law of Municipal Corporations § 34.74a (3d ed. 1970); 4A Nichols, The Law of Eminent Domain § 15.22 (J. Sackman rev. 3d ed. 1970); *New Orleans Gas Co. v. Drainage Comm'n*, 197 U.S. 453, 462 (1905)). Under the common law, "[t]he grantee of a franchise to use the streets takes it subject to the right of the municipality to make public improvements whenever and wherever the public interest demands, and if the improvement causes injury to the company, as by requiring it to relay or change the location of its pipes, tracks, or poles, or otherwise, the grantee of the franchise cannot recover damages from a municipality *unless otherwise provided by contract or statute*." 12 E. McQuillin, The Law of Municipal Corporations § 34.72 (3d ed. 1970). The Tennessee Supreme Court has expressly recognized this rule, having held in

the context of the removal of telephone lines and other facilities from a public right-of-way along a state highway that, "in the absence of a valid reimbursement statute, relocation costs under the common law rule must be borne by the utilities involved." *Pack v. S. Bell Tel. & Tel. Co.*, 387 S.W.2d 789, 793 (Tenn. 1965); *see also S. Cent. Bell Tel. Co. v. City of Chattanooga*, 578 S.W.2d 950, 952 (Tenn. Ct. App. 1978) (citing *Pack*, 387 S.W.2d at 793).

In Tennessee, the control of streets and highways rests primarily in the State. *City of Chattanooga v. Tenn. Elec. Power Co.*, 112 S.W.2d 385, 388 (Tenn. 1938). That power may become vested in a municipality where delegated by proper legislative authority, *BellSouth Telecomm., Inc. v. City of Memphis*, 160 S.W.3d 901, 912 (Tenn. Ct. App. 2004), but the General Assembly nonetheless has the power to enact laws that authorize the use of city streets and rights-of-way "without permission from the city." *Lewis v. Nashville Gas & Heating Co.*, 40 S.W.2d 409, 411 (Tenn. 1931). Thus, more than a century ago, the General Assembly passed what BST refers to as the Telecommunications Statute, Tenn. Code Ann. § 65-21-101, et seq., a state-wide scheme permitting telephone service providers to build their networks in the State. Pursuant to that scheme, the General Assembly enacted Chapter 66 of the Acts of 1885 (now codified at Tenn. Code Ann. §§ 65-21-105 through 65-21-107 and 65-21-201), which conferred upon telephone companies a statewide right to

> construct, operate and maintain . . . lines necessary for the speedy transmission of intelligence, along and over the public highways and streets of the cities and towns of this State, and on and over the land of private individuals, and upon, along and parallel to any of the railroads or turnpikes of this State, and on and over the bridges, trestles, or structures of said railroads; *Provided*, that the ordinary usage of such public highways, streets, works, railroads, bridges, trestles or structures and turnpikes be not thereby impeded. . . .

1885 Acts, Ch. 66, § 1 (current version at Tenn. Code Ann. §§ 65-21-201 & -202[3]).

In 1945, the General Assembly of Tennessee enacted legislation that empowers municipal housing authorities to carry out "redevelopment projects." Tenn. Code Ann. § 13-20-202(a); *see*

---

[3]The current version of the Telecommunications Statute likewise provides that any telephone company "may construct, operate, and maintain such telegraph, telephone, or other lines necessary for the speedy transmission of intelligence, along and over the public highways and streets of cities and towns, or across and under the waters, and over any lands or public works belonging to this state," Tenn. Code Ann. § 65-21-201, and that "[t]he ordinary use of such public highways, streets, works, railroads, bridges, trestles, or structures shall not be thereby obstructed . . . and just damages shall be paid to the owners of such lands, railroads, and turnpikes, by reason of the occupation of the lands, railroads, and turnpikes by the telegraph or telephone corporations. . . ." Tenn. Code Ann. § 65-21-202.

*generally* Tenn. Code Ann. § 13-20-101 *et seq.* (the "Housing Authorities Law"). That legislation is pertinent to the present case because it was amended in 1971 to provide for reimbursement to utility companies for the cost of relocating any facilities that had to be moved to accommodate a "redevelopment project" within the terms of the statute. More specifically, the 1971 amendment added Part 3 to the Housing Authorities Law to address "Relocation of Utility Facilities." Tenn. Code Ann. §§ 13-20-301 – 304. The "Findings and declarations" section of Part 3 states in pertinent part:

> The cost of utility relocation necessitated by redevelopment and urban renewal projects undertaken in accordance with [the Housing Authorities Law], and any amendments thereto, are properly a part of the cost of such projects, and it is in the public interest to provide for the equitable reimbursement of such cost of relocation; therefore, such relocation costs shall be included as part of the project costs of such redevelopment and urban renewal projects.

Tenn. Code Ann. § 13-20-301(d). Further, the statute provides that the statements pertaining to utility reimbursement "are legislative determinations and declarations of public policy, and . . . should be liberally construed . . . to promote the public interest." Tenn. Code Ann. § 13-20-301(e).

In accordance with the policy findings announced in § 13-20-301, § 13-20-303 mandates that:

> Whenever a municipality, housing authority, or other public body of this state determines that the relocation of public service facilities of a utility within a redevelopment or urban renewal project area is necessary to the carrying out of a redevelopment or urban renewal plan pursuant to the provisions of this chapter, *the municipality, housing authority, or other public body shall reimburse the utility for the cost of relocation of such facilities.*

Since enactment of the Housing Authorities Law, local housing authorities have had authority to undertake "redevelopment projects" designed to remove or address "blighted areas," which are defined by statute as areas with buildings or improvements which, by reason of various factors including dilapidation, obsolescence, overcrowding, deleterious land use, or any combination of those or other factors, are "detrimental to the safety, health, morals, or welfare of the community." Tenn. Code Ann. § 13-20-201. To that end, housing authorities may acquire blighted areas, clear such areas that have been acquired, relocate utility facilities, demolish buildings and improvements, and construct or reconstruct streets, utilities, parks, public open spaces and parking garages. Tenn. Code Ann. § 13-20-202(a). However, the Housing Authorities Law prohibits the initiation of any such redevelopment project until a "redevelopment plan" has been approved and adopted by the relevant city. Tenn. Code Ann. § 13-20-

203(a)(1).  The redevelopment plan must "provide[ ] an outline for the development or redevelopment of" the area covered by the plan, and it must be "sufficiently complete" to:

> (A) Indicate its relationship to definite local objectives as to appropriate land uses and improved traffic, public transportation, public utilities, recreational and community facilities and other public improvements; [and]
>
> (B) Indicate proposed land uses and building requirements in the area . . . .

Tenn. Code Ann. § 13-20-203(a)(1)(A) & (B).

In its motion for summary judgment, Metro argues that BST is responsible for the costs of relocating its lines and equipment from a public right of way unless some statute applies to override the common law.  According to Metro, neither the Housing Authorities Law nor any other statute applies under the facts of this case.  In response, and in support of its own motion for summary judgment, BST argues that the Public Square project required the removal of BST's lines from within a "redevelopment district" as defined by statute, that the project was a "redevelopment project" under the purview of Metro's "housing authority," the Metropolitan Housing and Development Agency ("MDHA"), and was developed in accordance with a "redevelopment plan" administered by MDHA.  Consequently, BST argues, Metro is responsible for the costs of relocating BST's lines pursuant to the reimbursement provision contained in Tenn. Code Ann. § 13-20-303.  Alternatively, BST argues that case law interpreting the Telecommunications Statute, Tenn. Code Ann. §§ 65-21-201 and -202, indicates that BST is entitled to reimbursement *whenever* relocation is required for reasons unrelated to the "ordinary use" of a roadway.

Because the Court determines, as set forth below, that BST is entitled to reimbursement under the Housing Authorities Law, Tenn. Code Ann. § 13-20-303, the Court does not reach BST's argument regarding "ordinary use" as it pertains to Count One.

### B.    Application of the Housing Authority Law

There is no dispute that MDHA is a "housing authority" for purposes of Tennessee's Housing Authorities Law.  MDHA is an agency of Metro government; its board is appointed by the Mayor with the approval of Metro Council.  As a housing authority, MDHA is charged with administering all of the "redevelopment districts" in Nashville and has the responsibility to review and approve all building permits issued for properties within the redevelopment districts that are being developed pursuant to a

redevelopment plan, thereby ensuring compliance with the redevelopment plans. Despite its status as an agency, MDHA operates largely independently of Metro. (Deposition of Joseph Cain ("Cain Dep.") at 60.)

Nashville has a number of redevelopment districts, including the Capitol Mall Redevelopment District (hereafter, the "Redevelopment District"), which was originally put in place in connection with the redevelopment of the Hermitage Hotel farther west up Union Street, but which now covers a large part of the downtown area. In June 2002, Metro Council, upon MDHA's request, approved expansion of the Redevelopment District to include a large portion of the property on which the Public Square project was developed, and approved amending the applicable Redevelopment Plan to require, among many other things, construction of a parking garage and park on the portion of the Courthouse property within the Redevelopment District.

MDHA's involvement in that project came about because in May 2001, in his State of Metro Address, the Mayor announced that the Stahlman Building, located across Union Street from the Metro Courthouse and which previously housed some of Metro's General Sessions Courts as well as other office space, would be redeveloped for residential uses. (Cain Dep. 14:7–11). As a result, in August 2001, MDHA issued a request for proposals for ("RFP") for redevelopment of the Stahlman Building. MDHA received responses to the Stahlman Building RFP in November 2001. One of MDHA's particular concerns relating to the Stahlman Building redevelopment project was the availability of parking for residents, so each of the developers providing an RFP was asked to address that question in its proposal.

In March 2002, MDHA selected the Mathews Company and its partners (hereafter, the "Mathews Company") to redevelop the Stahlman Building. As part of its proposal, the Mathews Company submitted a comprehensive "parking summary" in February 2002. (Cain Dep. at 16:22–23.) In this "parking summary," the Mathews Company proposed construction of an underground parking garage designed by a local architectural engineering firm on a portion of the site that was ultimately selected for the Public Square project, to be financed in part by tax increment funding. (*See* Doc. No. 31-8.) The Mathews Company had first suggested the possibility of an underground garage at the same location in a follow-up letter to its initial RFP response, dated December 11, 2001. (Doc. No. 31-11.)

In part because tax increment funding is only available for certain private projects located within redevelopment districts, MDHA, in furtherance of the Mathews Company's proposal, included both the

Stahlman Building and part of the property in front of the Metro Courthouse in the proposed expansion of the existing Redevelopment District. Pursuant to MDHA's request, the Metro Council passed Ordinance 2002-1033 on June 4, 2002. This ordinance expanded the Redevelopment District's boundaries as requested by MDHA to include a substantial portion of the area where the Public Square garage and park were ultimately built.

The parties dispute exactly how large a percentage of the total garage and park area comprised by the Public Square project is incorporated within the Redevelopment District, but there is no dispute as to the actual boundaries of the Redevelopment District. The Ordinance describes the boundaries, in relevant part, as running from the northeast corner of 8th Avenue and Union Street along the northern line of Union Street to the northwest intersection of Union Street and 3rd Avenue North. From that corner, the boundary line runs along the western edge of 3rd Avenue to the northwest corner of 3rd Avenue and Deaderick street, "thence eastwardly with the northern right-of-way of Deaderick Street to the northeast corner of the right-of-way of Deaderick and 1st Avenue North; thence southeastwardly with the eastern right-of-way of Deaderick and 1st Avenue North . . . ." (Ordinance No. 2002-1033, Ex. 5.) In other words, the Redevelopment District includes what the parties (and the Ordinance) refer to as Tracts 25 and 26, which are located directly in front of the Courthouse, between the Deaderick Street right-of-way and Union Street to the north and south, and between 3rd Avenue North and 1st Avenue North to the west and east, respectively. The Public Square garage and park spread over (and under) additional area that is not within the Redevelopment District, including a tract that lies between the Deaderick Street right-of-way and the front steps of the Courthouse, as well as some area to the east of the Courthouse. Based upon the language of Exhibit 5 to Ordinance No. 2002-1033, describing the redevelopment district as encompassing the Deaderick Street right-of-way, it is clear that the phone lines that had to be relocated were originally located within the expanded Redevelopment District.

Ordinance 2002-1033 also amended the preface to the Capitol Mall Redevelopment Project Plan to declare the finding and determination that the expanded redevelopment area, including Tracts 25 and 26, was a "blighted area within the scope of Section 13-20-201 through 13-20-209, of the Housing Authorities law"; and that "conditions existing therein are detrimental to the safety, health, morals or welfare of the people of Nashville and Davidson County." (Doc. No. 31, Ex. D, §§ 1 and 2.)

The section of Ordinance 2002-1033 relating to regulations and controls provides that the intended use of the specific area covered by Tracts 25 and 26 was "to provide for an underground parking structure, with park/plaza space above." (*Id.* at § 4 and Exhibit 2.) The stated design objective was to give "judicious consideration" to the "presence and architectural/historical importance of the Metropolitan Courthouse and the Stahlman building on either side of Tracts 25 and 26. New construction should be compatible with these structures in terms of materials, size, scale, setback, color and texture." (*Id.*) Joseph Cain, MDHA's Assistant Director of Real Estate and Urban Development, prepared a majority of Ordinance 2002-1033, and it was approved by MDHA's Board of Commissioners before it was submitted to the Metro Council for approval.

Meanwhile, independently of but basically concurrently with MDHA's efforts to expand the Redevelopment District in order to accommodate the redevelopment of the Stahlman Building and to provide parking for Stahlman Building residents, Metro, through its Real Property Services division, began drafting plans for the Public Square project to include a new underground parking garage topped with an above-ground park in front of and to the east of the Metro Courthouse, which would serve as a public square for downtown Nashville and provide parking for Metro employees and the public. Ken Maynard, Director of Metro's Real Property Services division, testified that the concept was developed shortly after September 11, 2001, and the initial proposal for the Public Square project was submitted for inclusion in Metro's capital budget in January or February 2002. (Doc. No. 27, Ex. 5, Deposition of Ken Maynard ("Maynard Dep.") at 33.)

There is no dispute that MDHA had virtually no involvement in the creation of the plans for the Public Square project or in the actual construction thereof. (Cain Dep. at 12–13.) Regardless, because a substantial portion of the area in which the Public Square project was to be built fell within the Redevelopment District as a result of the passage of Ordinance 2002-1033 and because use of that area was governed, pursuant to statute, by the terms of the Redevelopment Plan, oversight of the Public Square project fell to MDHA. Specifically, there is no dispute that all master permits issued for the Public Square project, including those associated with both the garage and with the park/plaza above the

parking garage, were required to and did receive final approval from MDHA. (Cain Dep. at 10–11.)[4] MDHA's Design Review Committee considered and approved the plans relating to the Public Square project, which was the last step in connection with MDHA's approval of the Public Square project. In approving the permits relating to the Public Square project, MDHA made the determination that the construction of the garage and park were in compliance with the redevelopment plan. (Cain Dep. at 11.) Metro, in fact, does not dispute that the portion of the Public Square project that falls within the Redevelopment District was developed and utilized in accordance with the Redevelopment Plan. (Cain Dep. at 92.)

The question before the Court is whether, given these undisputed facts, the Housing Authorities Law applies, thereby requiring reimbursement of BST's expenses incurred in relocating its facilities. Metro argues that the Housing Authorities Law should not apply because: (1) the funding for the Public Square project came entirely from General Obligation bonds and not from tax-increment financing as permitted by the Housing Authorities Law; (2) as a "housing authority" under the Housing Authorities Law, MDHA's role is to clear slums and urban blight, and Tracts 25 and 26, previously used as a surface parking lot for the Metro Courthouse, were not actually blighted; (3) the Redevelopment District includes only approximately half of the area occupied by the entire Public Square project; (4) MDHA's concern for providing parking for the Stahlman Building was incidental and coincidental, since MDHA did not actually participate in the development or construction of the Public Square project other than through its agreement with the Mathews Company to help negotiate with Metro to ensure parking availability for Stahlman Building residents[5]; (5) MDHA did not consider the Public Square project to be a "redevelopment project" within the meaning of the Housing Authorities Act; and (6) MDHA's involvement, in terms of oversight and the approval of permits, was no greater than or different from the degree of

---

[4]More specifically, MDHA approved the master permits for construction, but would not have been required to approve the individual "subpermits" for electrical and mechanical work, and so forth. (Cain Dep. at 11.)

[5]In the Development Agreement executed by and between MDHA and the Mathews Company regarding the development of the Stahlman Building, both parties to that agreement "acknowledge[d] the necessity of the construction of the adjacent parking facility . . . to accommodate the Stahlman Building and the Metro Courthouse" and recognized that the facility was to be constructed by "a third party." (Doc. No. 31-9 (Development Agreement), at ¶ 2.) MDHA expressly agreed to assist the Mathews Company with obtaining a lease or other agreement ensuring that the tenants of the Stahlman Building would have a certain number of monthly parking spaces available for their use. (*Id.*)

involvement required in *any* project, even private development projects, undertaken within a redevelopment district, such that its oversight in this case should not be considered dispositive.

None of Metro's arguments is persuasive. First, although tax-increment funding is made available through the Housing Authorities Law, nothing in the statute mandates the use of such funding. Second, regardless of Cain's testimony that he did not consider the area in front of the Metro Courthouse to be "blighted," his opinion is irrelevant given the definition of "blighted" contained within the Redevelopment Act itself and the wording of Ordinance 2002-1033 in which Metro Council made an express finding that the area within the Redevelopment District was "blighted" as that term is defined by statute, thereby justifying its inclusion within the Redevelopment District. Third, although only a portion of the Public Square garage and park fall within the Redevelopment District, the fact remains that MDHA acted as though the Public Square project was a redevelopment project within the purview of the Housing Authorities Law when it undertook to approve the plans and permits pertaining to the project. The fact that MDHA's involvement in the actual planning and construction was minimal is simply irrelevant given that BST's facilities had to be relocated from within the Redevelopment District in order to accommodate construction of the garage and park that were expressly made part of the Redevelopment Plan pursuant to Ordinance 2002-1033. The wording of the Ordinance itself is dispositive of the issue of whether the park and garage should be considered a redevelopment project.

Under the Housing Authorities Law, a city must reimburse a utility for the costs of relocating its public service facilities whenever (1) such facilities are within a redevelopment project area; and (2) the "municipality, housing authority, or other public body . . . determines that the relocation of [such facilities] is necessary to the carrying out of a redevelopment plan." Tenn. Code Ann. § 13-20-303. As previously indicated, there is no dispute that BST's facilities had to be relocated from within the expanded boundaries of the Redevelopment District. Relocation of the facilities was necessary to the construction of the Public Square garage, and it is clear from the language of the Ordinance—as well as the Development Agreement between MDHA and the Mathews Company—that the construction of the garage was a necessary and integral part of the Redevelopment Plan. The elements of the

reimbursement statute are met, and Metro is responsible for the costs of relocating BellSouth's facilities pursuant to Tenn. Code Ann. § 13-20-303.[6]

The Court finds that the relevant facts pertaining to both parties' motions are not disputed. Based on those facts, Metro's motion for summary judgment as to Count One of its Complaint must be denied, and BST's motion for judgment in its favor as to the same Count will be granted.

## IV.  COUNTS TWO AND THREE

### A.  Legal Standards for Issuing a Declaration or Permanent Injunction

The parties seek summary judgment on Counts Two and Three of Metro's Complaint as well. In Count Two, Metro asserts that it must, from time to time, "make alterations and improvements ('Roadway Improvements') to public roads, streets and other portions of the public rights of way in order to improve public safety, convenience and quality of life." (Complaint ¶ 26.) Metro further asserts that BST is required "[p]ursuant to law and contract," to relocate at its own costs any of its equipment within public rights-of-way that conflict with Roadway Improvement work. (Complaint ¶¶ 28, 29.) In its Memorandum in support of summary judgment, Metro clarifies that it seeks a judgment that '"absent a valid reimbursement statute, BST is required by the common law rule to relocate its lines and equipment at its expense when requested to do so by Metro on pending and future projects where necessary to accommodate public work in the same area." (Doc. No. 29, at 15.) Similarly, in Count Three, Metro seeks a permanent injunction barring BST from refusing in the future to relocate, at its cost and at Metro's reasonable request, BST equipment that interferes with public works undertaken by Metro.

This Court has the power to issue declarations of legal effect pursuant to the Declaratory Judgment Act, which provides in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations

---

[6]The Court further observes, however, that BellSouth apparently breached its statutory and contractual obligations when it refused to relocate its facilities from the Deaderick Street right-of-way to accommodate construction of the Public Square parking garage without being paid by Metro in advance. The applicable statute is a *reimbursement* statute; by definition, reimbursement means being paid back, repaid, compensated for out-of-pocket expenditures, as BST expressly acknowledges in its brief when it states that "Metro has a statutory obligation to reimburse BST for costs of relocating its telecommunications facilities in connection with the Public Square Redevelopment Project." (Doc. No. 31, at 15.) Because Metro has not claimed actual damages resulting from that failure, other than those sought in connection with its claim to recover the relocation costs, BST's failure in that regard does not warrant judgment in favor of Metro as to Count One.

of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The Sixth Circuit has articulated five factors district courts should consider in deciding whether to exercise their discretion to issue a declaration:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citations omitted).

Likewise, the Supreme Court has recently reiterated the familiar four-factor test that a plaintiff seeking a permanent injunction must satisfy before a court may grant such relief:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, –- U.S. —, 126 S. Ct. 1837, 1839 (2006).

**B.    Application of the Standards to the Facts**

Metro did not reference or address these considerations in support of its motion for summary judgment. In its response to Metro's motion, however, BST argues that there are no specific pending disputes for which Metro seeks relief (other than the Public Square project) and that any future disputes will, like the one regarding the Public Square, involve complex factual issues and will need to be resolved on their own merits such that declaratory relief would not serve a useful purpose. BST also argues that injunctive relief is not warranted because alternative remedies are available in that Metro "can seek reimbursement for [its] costs in relocating the telecommunications facilities to the extent disputes may arise in the future, just as it has done here. The reimbursement remedy represents the traditional means of recovery for a party in Metro's position." (Doc. No. 39, at 21.) Thus, BST argues that Metro has not shown that it lacks an adequate remedy at law, nor has it shown irreparable injury.

The Court agrees that Metro is not entitled to a permanent injunction, because it has not shown that it has suffered an irreparable injury or that monetary damages are inadequate to compensate it for any damages incurred. With respect to the declaration requested in Count Two, however, the Court finds

that a limited declaration would serve a useful purpose in clarifying the legal relations at issue without increasing friction between our federal and state courts or improperly encroaching upon state jurisdiction[7]; and that there is no alternative remedy which is better or more effective. *Grand Trunk*, 746 F.2d at 326.

Specifically, the Court recognizes that Tennessee has adopted the common law rule that when a utility is required to remove its facilities from a public right-of-way to accommodate public works, "in the absence of a valid reimbursement statute [or contract], relocation costs under the common law rule must be borne by the utilities involved." *Pack v. S. Bell Tel. & Tel. Co.*, 387 S.W.2d 789, 793 (Tenn. 1965). The Tennessee statutes that qualify as reimbursement statutes, including the Housing Authorities Law and the Tennessee Highway Act,[8] Tenn. Code Ann. §§ 13-20-303, 54-5-804, and are unequivocal in the language permitting utilities to recuperate their costs.[9] Neither of these statutes permits a utility to refuse to relocate its equipment upon the governmental authority's reasonable request, nor to demand payment up front prior to complying with the request thereby creating a dispute and potentially delaying a public works project. Moreover, both appear to place the onus of bringing suit, in the event of a controversy, upon the utility rather than on the city or state. BST's refusal in this case to relocate its equipment without compensation *in advance* clearly did not comply with the terms of § 13-20-303, regardless of the fact that the statute ultimately required Metro to bear the costs of relocation under the facts of this case.

More to the point, for situations in which no express reimbursement statutes applies, BST's position is that it is only required to comply with requests to relocate its facilities at its own expense if the public works project at issue is intended to benefit the "traveling public," such as a road-widening project, but that it is entitled "to obtain reimbursement for its relocation costs when a project does not benefit the traveling public, such as for beautification or another purpose." (Doc. No. 31, at 20, citing Ex. K, Brinkley Decl. ¶ 4.) This position is based upon BST's interpretation of Tenn. Code Ann. § 65-21-201, as

---

[7] Although the legal issues raised involve questions of state law exclusively, it appears that there will always be diversity jurisdiction as between the parties to this lawsuit, so it is likely that future disputes on similar issues between the same parties will end up before this Court.

[8] As Metro points out, the Tennessee Highway Act, Tenn. Code Ann. § 54-5-801 et seq., authorizes utility relocation reimbursement on certain projects undertaken by the State of Tennessee, and will never apply to projects undertaken by Metro.

[9] There may exist other reimbursement statutes under Tennessee law, but the Housing Authorities Law and the Tennessee Highway Act are the only two that have been brought to the Court's attention as potentially applicable in this case.

permitting it to place and maintain its facilities along and over the public highways and streets of cities and towns, subject *only* to the requirement that such placement not interfere with the "ordinary use" of the public rights-of-way. (*See* Doc. No. 39, at 14.) According to BST, the statute was designed to attract and encourage telephone providers to build their network throughout the state, and, apart from the requirement that the utilities not interfere with the "ordinary use" of the roadways, the law contains no provision permitting cities to require telephone providers to relocate facilities after they were lawfully placed. BST further argues that, because the statute (originally passed in 1885) predates any common-law principle that could have developed around the issue of the necessity of relocating telephone or other utility facilities, the ordinary rule that statutes in derogation of the common law are to be strictly construed, does not apply.

In other words, based on BST's interpretation of the Telecommunications Statute, it has the power unilaterally to refuse to move its facilities *at all*, even to accommodate public works within a municipality that are clearly intended to benefit the general public, if such work is undertaken for some purpose other than to benefit the traveling public. If, for instance, the Public Square project had *not* fallen within the Housing Authorities Law, BST's position would mean that it had the ability to refuse to relocate its facilities altogether, not merely that it could refuse to relocate them except upon advance payment by the city to cover its costs. Such a result would clearly be absurd.

BST may disavow this extreme result, but such is the logical thrust of its proposed construction of the Telecommunications Statute and the case law construing it. Specifically, according to BST, the referenced statutory provisions entitle BST "to place and maintain its facilities along and over the public highways and streets of cities and towns. BST's right to maintain its facilities [is] only secondary to the 'ordinary use' of public rights-of-way." (Doc. No. 39, at 14.) The "ordinary use" of such public rights-of-way, again according to BST, encompasses use of the roads and streets by the "traveling public." (Doc. No. 39, at 17.) Thus, road repair, expansion of the roadway to facilitate increased traffic and so forth would qualify as activities intended to promote the ordinary use of the roads, to which BST's rights would be subordinate. Any other use or reallocation of public city streets for any other purposes such as beautification or the development of parks, green space or parking areas would apparently not constitute the "ordinary use" thereof under BST's definition. If BST's ability to use a public right-of-way is secondary

*only* to the "ordinary use" of the roads, that is, use for the benefit of the traveling public, then by extension, BST would have the option not merely to demand payment to relocate its lines to accommodate such non-ordinary use (as it claims), but to refuse to relocate its facilities altogether, thus effectively holding hostage public works intended to benefit the general public.

The cases upon which BST relies for its position do not go that far. In *Tennessee v. United States*, 256 F.2d 244 (6th Cir. 1958), the United States (the "Government") brought suit to take land by right of eminent domain in order to build a scenic parkway and highway into the Great Smoky Mountains National Park. The Court noted that the "real purpose of the government's action was to obtain a determination of the right of Southern Bell [Telephone Company] to be compensated for the removal and permanent relocation of its telephone line between Banner Bridge and Gatlinburg, Tennessee." *Id.* at 250. The facts and procedural background of the case are lengthy and convoluted, but the Sixth Circuit noted that, at a conference between representatives of the National Park Service, Tennessee, Sevier County, and Southern Bell regarding the removal and relocation of Southern Bell's telephone line from the right of way along the highway between Banner Bridge and Gatlinburg, Tennessee, Southern Bell expressly "declined to remove and relocate its line unless it was compensated for its expense in connection with such removal and relocation," and its refusal led to the litigation. *Id.* at 249.

Despite Southern Bell's refusal to remove its line, construction by the Government of the scenic parkway and highway between Banner Bridge and Gatlinburg was begun and carried out up until it became necessary to relocate part of Southern Bell's telephone line and facilities in order to continue. At that point, Southern Bell reiterated its refusal to remove and relocate its line and filed suit in state court against the construction company conducting the work to enjoin it from molesting or interfering with the line. *Id.* at 249–50. That action was removed to federal court and a preliminary injunction issued in Southern Bell's favor, which was conditionally dissolved upon the Government's offer to provide a temporary location for the line during the construction of the parkway and highway.

In addition to the various claims for relief asserted by the Government and Southern Bell, the State filed a cross-claim against Southern Bell asking for "a decree that Southern Bell be required to remove its telephone line from its present location and relocate the same on the scenic parkway at its own expense. The state further asked that a mandatory injunction be issued requiring Southern Bell to so

remove and relocate its telephone line at its own expense." *Id.* at 250. Southern Bell, in its answer, asserted that, to the extent its line was located within the public right of way, it had "a perpetual and irrevocable franchise or easement for the line." *Id.* at 251. Southern Bell further claimed that, since the State had deeded the public land in question to the Government for construction of the scenic parkway and highway, "the state [was] without police power to compel the removal and relocation of its line." *Id.*

The district court, after a bench trial, ruled in favor of Southern Bell. On appeal, the Sixth Circuit considered "whether or not Southern Bell can legally be compelled to remove and relocate its present telephone line between Banner Bridge and Gatlinburg." *Id.* at 255. Citing to what is now Tenn. Code Ann. § 65-20-201 and -202, the court noted that the evidence clearly established that the telephone line at the time the action was commenced "obstructed the ordinary use and the necessary widening and improvement of the public highway between Banner Bridge and Gatlinburg, made necessary by the greatly increased vehicular traffic to and from the national park." *Id.* at 256. The court further disagreed with Southern Bell's contention that the state lacked the police power to compel it to remove its lines from the right of way, stating:

> This contention is without merit, as the telephone line was originally constructed and established under the permissive right granted by state statutes, §§ 3904, 3[905] [currently §§ 65-20-201 and -202] . . . which provided that a telephone line should not obstruct the ordinary use of the state's public highways. The widening and improvement of the highway in question were necessary for the safety and general welfare of the people of Tennessee, and the state could not bargain or give away its police power to establish regulations reasonabl[y] necessary for the safety and welfare of its people.

*Id.* at 256 (citations omitted). Further, and more importantly, the court continued:

> The telephone line here in question was originally located by permission granted by state statute, and the law is well established that a statutory, permissive right of use of public highways by public utilities *is subordinate to the rights of the public*; that the original location of poles or other facilities in a public highway does not create an irrevocable right to have such poles and facilities remain forever in the same place; and that *a utility company may be required to relocate its lines at its own expense when such relocation is demanded by public necessity and for public safety and welfare*.

*Id.* at 258 (citations omitted; emphasis added). Finally, the court held that Southern Bell was not entitled to compensation for the removal and relocation of that part of its telephone line located within the public right of way (as opposed to in an easement over private lands). *Id.* at 264.

While BST relies on *Tennessee v. United States* in support of the proposition that it may only be required to remove its lines, at its own expense, in order to accommodate the "ordinary use" of the

roadways, it is important to note that the court did not hold that road expansion to accommodate increased traffic was the *only* ordinary use of the roadways, nor did it hold that such was the only legitimate basis for causing a telephone company to relocate its facilities. Rather, the court noted that the use of the public rights-of-way by a utility is *always* "subordinate to the rights of the public," and that a utility may be required to locate its lines *at its own expense whenever* "such relocation is demanded by public necessity and for public safety and welfare." *Id.*

At least one Tennessee court has reached a similar conclusion in the context of the necessary relocation of telephone facilities within a city. In *Southern Bell Telephone & Telegraph Co. v. City of Nashville*, the Tennessee Court of Appeals noted that a telephone company's "right to occupy the streets is . . . subject to the valid exercise of its police power by the defendant City. In order to be valid this exercise of its police power must not be unreasonable or arbitrary and its exercise must have a reasonable relation to the end sought to be obtained." 243 S.W.2d 617, 619 (Tenn. Ct. App. 1951). The ultimate holding in that case was that an ordinance requiring the telephone company to relocate its telephone facilities at its own expense at a railroad grade elimination project was unreasonable and discriminatory because the project "was not a project of the City of Nashville under its police power or any of its charter provisions but a project of the Federal Government for the benefit of the public and the Railroad Company, which was to be paid for by the Government," and because the government had entered into contracts with every other utility company whose facilities were implicated by the project, except the telephone company, and agreed to reimburse their expenses. *Id.* at 620. In other words, the decision strongly implied that, under Tennessee law, if the project had been an improvement project undertaken by the City of Nashville under its police power and the City had not unfairly discriminated between the different utilities, it would have had the ability to require the telephone company to remove and relocate its facilities at its own expense. [10]

---

[10]In the case at bar, Metro has argued that the 1888 Franchise Agreement requires BST to move its lines at its own expense reasonably requested to do so to accommodate a public project. The City made a similar argument in *Southern Bell* which the Court of Appeals rejected, noting that the franchise language at issues states: "[I]if any of the cables, wires and poles *now erected and in operation* are so located as . . . to injuriously affect the welfare of the City, or any of the citizens thereof," then the telephone company must move them at its own expense. *Id.* at 619. In construing this provision, the court found it "obvious" that it could not apply to wires or other facilities put in place after the passage of ordinance approving the Franchise Agreement. The parties here do not address the question, but the

That implication is supported by Tennessee Court of Appeals' more recent holding in *South Central Bell Telephone Company v. City of Chattanooga*, in which the court noted: "Prior to 1971, the law in Tennessee was to the effect that a city, in carrying out an urban renewal, slum clearance or redevelopment project, could require utilities using the public right-of-way to relocate their property at their expense. . . . In each case [decided before 1971] the [Tennessee Supreme] Court held that absent a valid reimbursement statute, the utilities must bear the expense." 578 S.W.2d at 952 (citations omitted). In that case it was clear that, if the Housing Authorities Law had not applied, the telephone company would have had to bear the costs of relocation, just as in this case, BST would have been required to bear the costs of relocating its facilities in order to accommodate the Public Square project if the Housing Authorities Law had not applied, regardless of whether the "traveling public" was intended to benefit from the project.[11]

The facts relevant to Metro's motion for summary judgment on its claim for a declaration, viewed in the light most favorable to BST, including the following: (1) BST distinguishes between projects intended to benefit the "traveling public," such as a road-widening project, and those that do not, such as a beautification project (Declaration of J.M. Brinkley, Doc. No. 31-12 ("Brinkley Decl."), at ¶ 4; (2) BST's "custom and practice" has been to pay its own facility relocation costs only when a relocation is to benefit the "traveling public" (*id.*); and (3) BST admittedly "does not relocate equipment it [believes it] has the legal right to maintain without payment" (Answer, Doc. No. 5, at ¶ 3). For instance, BST demands payment to relocate its facilities from a right of way if a street is closed to allow for the expansion of a Metro school (Brinkley Decl. ¶ 5), or to accommodate a Metro greenways project (Brinkley Decl. ¶ 6).[12]

Despite these concessions, BST contends that a declaration is not warranted because the issue of which entity must bear the relocation costs is a fact-specific inquiry that must be decided on an

Court presumes that none of BST's actual facilities were in place at the time the franchise ordinance was effected in 1888.

[11]The public improvements undertaken in *City of Chattanooga* were arguably of the type intended to "benefit the traveling public," as they included "widening of the streets and the installation of curbs, drainage, and sidewalk facilities." 578 S.W.2d at 952. The court's analysis did not rely on that fact at all however. Instead, it applied an extremely broad interpretation of the Housing Authorities Law to find that the City should bear the utility relocation costs.

[12]There is no indication in the record whether any of these projects might have fallen within the purview of the redevelopment statute.

instance-by-instance basis. BST also points out that this is the first lawsuit in many years between these two parties, despite a vast number of projects that require regular coordination between them, thus demonstrating the parties' ability to reach an agreement without the court's intervention in nearly every case. Notwithstanding, the Court finds that a declaration is necessary to clarify the parties' legal relations, to prevent future disputes, and to facilitate legitimate projects undertaken by Metro to benefit the public welfare generally.

Thus, based upon the undisputed fact that BST refuses to bear the costs of relocating any of its facilities to accommodate Metro projects that it does not consider to benefit the "traveling public," the Court will enter a declaration to the following effect:

(1)     Under Tennessee common law, in the absence of a valid reimbursement statute (or contract), Metro has the police power to require BST to relocate its lines from public rights-of-way, at BST's expense, to accommodate public works reasonably necessary to benefit the public welfare, regardless of whether they benefit the so-called "traveling public," whether pedestrian or vehicular.

(2)     The Telecommunications Statute itself is not a reimbursement statute. It simply authorizes the establishment and maintenance of telephone facilities in public rights-of-way at no cost to the telephone companies.

The Court is aware that this declaration will not necessarily put an end to future disputes between these parties, as BST will undoubtedly contest the reasonableness of some Metro public works projects. The Court nonetheless believes the declaration to be a correct statement of current Tennessee law, and is confident that it will obviate most controversies by clarifying the parties' legal relations. *Grand Trunk*, 746 F.2d at 326.

**V. CONCLUSION**

For the reasons set forth above, the Court will grant in part and deny in part Metro's motion for summary judgment, and will grant in part and deny in part BST's motion for summary judgment. More specifically, BST is entitled to summary judgment in its favor as to Counts One and Three, and Metro is entitled to summary judgment in its favor as to Count Two. The Court will enter a declaration consistent with the analysis set forth herein, and will dismiss the remaining counts of Metro's complaint.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge